

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| SPECTRUM ENGINEERING, INC. | § | |
| | § | |
| DEBTOR(S) | § | CASE NO. 10-34067 |
| XL SPECIALTY INSURANCE | § | |
| COMPANY | § | |
| | § | |
| PLAINTIFF(S) | § | ADVERSARY NO. 10-3290 |
| | § | |
| VS. | § | |
| DAVID J. ASKANASE, as Chapter 7 | § | |
| Trustee for Spectrum Engineering, Inc. | § | |
| and Baker Petrolite Corporation | § | |
| DEFENDANT(S) | § | |

# OPINION

XL Specialty Insurance Company filed a declaratory judgment action against Debtor Spectrum Engineering, Inc., David J. Askanase, Chapter 7 trustee, and Baker Petrolite Corporation seeking a determination of its rights and duties under an insurance policy issued to Spectrum. XL contends that the claims in the action styled Baker Petrolite Corporation vs. Spectrum Engineering Inc. Adversary No. 10-3290 filed March 5, 2010 and removed to the Southern District of Texas do not fall within the scope of coverage provided by the XL policy.

Before the Court are cross motions for summary judgment filed by XL and the

trustee on behalf of Spectrum, in which Baker Petrolite (BPC) joined. Most contentions in each motion raise fact issues. However, the pivotal issue in the case is whether BPC made a demand, as defined by the policy, at the February 7, 2009 meeting between representatives of debtor and BPC. After reviewing the cross motions, responses, and policy language, the Court finds that a material fact issue exists with respect to the decisive issues at the crux of the case i.e. was there a claim made as defined by the XL policy within the policy period and does XL have a duty to defend or indemnify the debtor.

## I. FACTS
### A. The XL Policy

XL issued the Policy, Number DPR9615179, to Spectrum for the policy period January 15, 2009, to January 15, 2010. The limits of liability are $2 million per claim, subject to an annual aggregate of $2 million. The policy is subject to a $150,000 per claim deductible (inclusive of claim expenses), with no aggregate limit on deductibles. The policy is exhibit 1 to debtor's motion for summary judgment. (Trustee's Doc. 51, Ex. 1).

The Insuring Agreement of the Policy provides, in pertinent part:

I. INSURING AGREEMENT

To pay on behalf of the INSURED all sums in excess of the Deductible, subject to the Policy Limits of Liability, which the INSURED shall

become legally obligated to pay as DAMAGES and/or CLAIM EXPENSES as a results of CLAIM(S) first made against the INSURED during a POLICY YEAR within the POLICY PERIOD and first reported to the Company, in writing, during that POLICY YEAR or within sixty (60) days after the end of that POLICY YEAR and:

> 1. the CLAIM(S) arises out of a WRONGFUL ACT;

> 2. such WRONGFUL ACT must have been committed or alleged to have been committed subsequent to the Retroactive Date(s) stated in Item 6 of the Declarations; and

> 3. prior to the inception date of this Policy, none of the INSURED's directors, officers, principals, partners or insurance managers knew or could have reasonably expected that such WRONGFUL ACT might give rise to a CLAIM(S).

*Id.* at 3.

The Policy contains the following Deductible provision:

VII. LIMITS OF LIABILITY AND DEDUCTIBLE

E. Deductible

As stated in Item 4. of the Declarations, the INSURED must pay the Deductible obligation for DAMAGES and CLAIM EXPENSES, whether or not DAMAGES are paid, before the Company is obligated to pay. The Deductible applies separately to each CLAIM(S) whether this insurance is primary or excess. The Company will determine the reasonableness of CLAIM EXPENSES that qualify in satisfaction of the Deductible.

The Policy defines XL's defense obligation in part as follows:

VIII. DEFENSE, SETTLEMENT AND COOPERATION

> A. With respect to the insurance afforded by this Policy, the Company shall defend any CLAIM(S) against the INSURED seeking DAMAGES to which this insurance applies, even if any of the allegations are groundless, false or fraudulent. The Company has the right to designate legal counsel. It is further agreed that the Company may make such investigation of any CLAIM(S) as it deems expedient, but the Company shall not be obligated to pay DAMAGES or to defend or to continue to defend any CLAIM after the applicable limits of the Company's liability have been exhausted by payment of DAMAGES and/or CLAIM EXPENSES.

*Id.* at 10.

The Policy contains the following definitions, inter alia:

> III. DEFINITIONS
>
> A. CLAIM(S) means a demand received by the INSURED for money or services and which alleges a WRONGFUL ACT arising from the performance of PROFESSIONAL SERVICES. The definition of CLAIM(S) shall include, but not necessarily be limited to lawsuits, petitions, arbitrations or other alternative dispute resolution requests filed against the INSURED.
> .....
>
> I. POLICY PERIOD means the period from the effective date of this Policy to the Policy expiration date as stated in Item 2. of the Declarations or its earlier termination date, if any. POLICY PERIOD does not include any automatic extended reporting period. If the length of the POLICY PERIOD is the same as the POLICY YEAR, the terms POLICY PERIOD and POLICY YEAR are used interchangeably herein.
>
> J. POLICY YEAR means each consecutive twelve (12) months of the POLICY PERIOD beginning on the effective date shown in the Declarations. However, if a POLICY YEAR within a POLICY PERIOD is modified by an endorsement, then that modified year will

be deemed a POLICY YEAR for the purpose of determining the aggregate Limit of Liability and any aggregate Deductible.

.....

M. WRONGFUL ACT means a negligent act, error, or omission in the performance of PROFESSIONAL SERVICES by an INSURED or any person or entity for whom the INSURED is legally liable. A WRONGFUL ACT can not arise from a dishonest, fraudulent, malicious, or criminal conduct committed by an INSURED or at the INSURED's direction or with the INSURED's prior knowledge. However, WRONGFUL ACT includes PERSONAL INJURY arising out of the performance of PROFESSIONAL SERVICES.

*Id.* at 4-6.

The Policy contains the following "Extended Reporting Period" provision:

VI. EXTENDED REPORTING PERIOD

In the event of termination of this insurance for any reason of non-renewal or cancellation by the INSURED, or if the Company shall cancel this Policy or terminate it by refusing to renew, for reasons other than the NAMED INSURED's non-payment of premium and/or Deductible amount and/or non-compliance with the terms and conditions of this Policy, the INSURED:

A. shall be entitled to a sixty (60) day Automatic Extended Reporting Period for no additional premium. This extension shall apply to CLAIM(S) first made against the INSURED during the POLICY YEAR and reported to the Company, in writing, during the sixty (60) days immediately following the effective date of cancellation or non-renewal.

*Id.* at 8-9.

### B. The BPC Action

XL contends that as of January 15, 2010, BPC had not made a CLAIM against Spectrum for money or services that alleged a WRONGFUL ACT arising from the performance of PROFESSIONAL SERVICES (as those terms are used in the Policy). XL denies that the February 7, 2009 meeting between representatives of BPC and debtor resulted in a claim.

By letter dated January 20, 2010, BPC made a "demand upon Spectrum Engineering, Inc. ('Spectrum') to pay BPC for its damages occasioned by the substandard work provided by Spectrum incident to its work at BPC's Bayport facility."

Spectrum did not respond to BPC's January 20, 2010, letter. Spectrum did not report BPC's January 20, 2010, letter to XL until after the end of extended reporting period.

On or about March 5, 2010, BPC filed its petition against Spectrum, . (XL Doc. 55, Ex. C.) XL received a copy of the petition on or about March 15, 2010.

The petition alleges that, in November 2007, BPC accepted Spectrum's $734,000 lump-sum bid for engineering-design work relating to the contemplated addition of new reactors at BPC's existing Bayport Plant in Pasadena, Texas. petition, ¶ 6. Spectrum's bid was accepted "based upon its representations about its

broad abilities and many qualified personnel." *Id.* Spectrum's work was to be completed by April 8, 2008. *Id.* BPC also agreed to use Spectrum's services to design a quench tank. *Id.*

BPC alleges that Spectrum was unable to keep its work on schedule and that in May 2008, BPC stopped Spectrum's work on the quench tank. *Id.*, ¶¶ 7, 8. BPC had paid Spectrum $153,000 as of that time for its work on the quench tank. *Id.*, ¶ 8. In July 2008, BPC hired H&M Engineering to take over and complete that work; allegedly "H&M Engineering had to redo essentially all of Spectrum's substandard prior work, at an additional cost to BPC of $80,780.00, in order to complete the job." *Id.* BPC contends that Spectrum delivered its engineering-design work four months late, in August 2008. *Id.*, ¶ 9. Spectrum's work product allegedly "was incorrect, incomplete, and/or incompatible with BPC's specifications and needs, resulting in increased contractor charges to BPC from Austin Industrial and others totaling $1,162,409 (including, for example, $402,438.00 in required changes to the building's foundation) and disruption to BPC's operations." *Id.*

BPC further alleges:

> As a result of Spectrum's deficient design plan, BPC was unable to realize its April 2008 completion date. As a result, a four-month delay in start-up resulted in approximately $11.5 million of lost product sales to its customers due to BPC's inability to make the product. Due to Spectrum's various acts and omissions, BPC has suffered both

> out-of-pocket losses as well as other damages, including attorneys' fees. The damages incurred to date include, at a minimum, the monies paid to Spectrum for its tardy, deficient work, BPC's lost production, and work order expenses directly necessitated by Spectrum's substandard work product.

*Id.* ¶ 10.

The BPC petition states causes of action for breach of contract, breach of warranties, and negligence. (XL Doc. Ex. C), ¶¶ 12-14. BPC seeks recovery of actual damages in the amount of at least $1,396,189, additional damages in the amount of at least $11,500,000, attorneys' fees and costs, and pre- and post-judgment interest. *Id.*, Prayer for Relief.

By letter dated April 19, 2010, XL informed Spectrum that the policy does not provide coverage for the claims asserted by BPC in the petition because, inter alia, no "Claim" was first made against Spectrum during a "Policy Year" within the "Policy Period." XL advised Spectrum to protect its interests in the BPC Action, because XL would not provide a defense.

Spectrum subsequently advised XL that Spectrum did not intend to file any document responsive to the petition. To avoid the possibility of a default judgment being entered against Spectrum, XL retained counsel to file an answer to the petition on Spectrum's behalf.

On or about April 27, 2010, XL's counsel sent a letter to Spectrum reiterating

that XL disclaimed coverage for the BPC matter. In the letter, counsel advised, *inter alia*, that an answer had been filed to avoid a potential default judgment, that Spectrum had not satisfied any portion of its $150,000 deductible under the policy, and that XL reserved all of its rights under the policy, at law, and in equity.

BPC and the trustee for Spectrum contend that the February 7, 2009 meeting was a claim for services or money as defined by the policy. Spectrum objects to the numerous unauthenticated exhibits on which XL relies. However, even excluding consideration of contested exhibits, the Court finds that the declaration of Craig Borel, former Vice President of debtor who had major responsibility for the BPC contract (XL Doc. 55, Ex. J), raises a material fact issue with regards to whether BPC made a claim made to debtor during the policy period, January 15, 2009 to January 15, 2010.

Consequently the cross motions are denied.

Signed this 3 day of April, 2014 at Houston, Texas.

_____
KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE